*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ADELA TOMAN,

        Plaintiff-Appellant,

v

CARRIE MCDANIELS, PTA, DANIELLE
SCHUELER, COTA-L, and SPARROW
HOSPITAL,

        Defendants-Appellees.

FOR PUBLICATION
November 21, 2023

No. 361655
Ingham Circuit Court
LC No. 21-000600-NH

Before: RIORDAN, P.J., and BORRELLO and BOONSTRA, JJ.

BORRELLO, J. (*dissenting*)

Although memories have seemingly faded, in March 2020, the entire world faced a public health crisis the likes of which no one alive had ever endured. During the first four months of the COVID-19 emergency, i.e., the period during which the relevant emergency orders were in effect, approximately 125,000 Americans died of the disease[1] and hospitals were overflowing with critical care patients. Little was understood about the nature of the disease, its treatment or its mechanism of spread. A "stay at home" order issued by Governor Whitmer was in effect from March 23, 2020 to June 1, 2020. Business activity and social life all but disappeared. Family members could not visit their sick and dying relations as hospitals, nursing homes and retirement communities barred all non-essential visitors. Retail operations and restaurants were closed. Millions were laid off

---

[1] Woolf et al., Excess Deaths From COVID-19 and Other Causes, March-July 2020, JAMA <https://jamanetwork.com/journals/jama/fullarticle/2771761> (accessed November 14, 2023) ("Of the 225,530 excess deaths [from March 1 through August 1, 2020], 150,541 were attributed to COVID-19."); Pew Research Center, The Changing Political Geography of COVID-19 Over the Last Two Years <https://www.pewresearch.org/politics/2022/03/03/the-changing-political-geography-of-covid-19-over-the-last-two-years/> (accessed November 14, 2023) (roughly 125,000 deaths in the United States from March 2020 through June 2020).

from work as much of the economy was simply closed down.[2]  Virtually no one came to their office for as long as a year.  Schools were closed.  The state adopted a number of sweeping emergency public health measures.[3]

In the first days of the pandemic emergency, the Michigan Supreme Court had to determine what steps to take to assure public health and comply with the Governor's emergency declaration, while also assuring that no one's right to access the courts would be limited as a result.[4]  It did so by adopting Administrative Order (AO) No. 2020-3, AO 2020-3 as amended, and AO No. 2020-18.  The last of these ordered that the emergency period end as of June 20, 2020 and it directed how statutes of limitations were to be calculated once the emergency period was over.

With the rescission of the emergency orders in AO 2020-18, disputes arose about whether the Supreme Court (1) went beyond its constitutional authority in issuing the emergency orders, and (2) how to calculate the statute of limitations post-emergency.  Both of these questions are now before our Supreme Court.  That Court has granted leave in *Carter v DTN Mgt Co*, 511 Mich 1025 (2023), and has ordered oral argument on the application in *Armijo v Bronson Methodist Hosp*, 511 Mich 1026 (2023).  Thus, it is ultimately the Supreme Court—both as drafter of the orders and the state's final legal authority—that will ultimately determine what that order means and how it should be applied.

In the meantime, since this Court decided *Carter v DTN Mgt Co*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 360772), nearly one year ago, this Court and trial courts have consistently held that the AOs tolled the relevant statute of limitations for all matters that arose prior to or during the emergency period.  *Carter* based its conclusion largely on the plain text of the emergency orders, particularly AO 2020-18.  All three AOs made clear that they applied to "the commencement of *all* civil and probate case types," (emphasis added), not merely to those cases in which the limitations period expired during the emergency period.  And AO 2020-18 is of particular importance since it was in that order—and only that order—in which the Supreme Court provided explicit directions as to how to calculate the limitations period following the end of the emergency period.  That AO provided in pertinent part:

---

[2] In March 2020, national unemployment claims soared from 281,000 claims just before the emergency began to 3.3 million by March 26.  Lexi Lonas, The Hill, *The COVID-19 shutdown: A timeline of how the pandemic changed the US economy* <https://thehill.com/business/3478647-a-timeline-of-the-covid-19-economy/> (posted May 5, 2022) (accessed November 13, 2023).

[3] In addition to the "stay at home" order, other measures taken during the period in which the Supreme Court's administrative orders were in effect include: the closing of K-12 schools, mask mandates, the banning of gatherings greater than 10 people, a ban on dine-on eating, limitations on non-essential travel, and many more.  *Michigan COVID-19 Timeline* <https://covidmapping.org/timeline.html> (accessed on November 12, 2023).

[4] The Administrative Orders did not simply reflect that most courts were closed during much of the early period of the pandemic.  It also reflected that with most activities of business and human interaction shut down for several months such that the typical non-court activities of pre-suit investigation, discovery and virtually any litigation activity could not realistically proceed.

For time periods that started before Administrative Order No. 2020-3 took effect, the filers shall have the same number of days to submit their filings on June 20, 2020, as they had when the exclusion went into effect on March 23, 2020. For filings with time periods that did not begin to run because of the exclusion period, the filers shall have the full periods for filing beginning on June 20, 2020. [AO 2020-18.]

The text is clear. For *all* cases—that arose before as well as those that arose during the emergency period—the days between March 23, 2020, and June 20, 2020, were not to be counted in calculating the limitations period. First, as to cases that arose before the AOs, AO 2020-18 requires that "the filers shall have the same number of days to submit their filings on June 20, 2020 as they had when the exclusion went into effect on March 23, 2020." And for those cases with time periods that did not begin to run because of the exclusion period, "the filers shall have the full periods for filing beginning on June 20, 2020."

The majority insists that the only limitations periods that are subject to the emergency tolling are those that would have expired during the period. However, the plain language of the AO 2020-18 makes clear that such a conclusion is erroneous. By definition, cases that arose during the emergency period, i.e., those whose "time periods that did not begin to run because of the exclusion period" could not possibly have expired during the emergency period. Yet, according to the majority, we should ignore the plain language of AO 2020-18 and count the excluded days even though such filers, by the terms of the order, are entitled to "the full periods for filing beginning on June 20, 2020." For example, a case arising on April 1, 2020, the days from April 1, 2020 to June 20, 2020 could not be counted. The majority all but ignores AO 2020-18, and instead focuses solely on its interpretation of the word "during" in AO 2020-3. AO 2020-3 reads:

> For all deadlines applicable to the commencement of all civil and probate case-types, including but not limited to the deadline for the initial filing of a pleading under MCR 2.110 or a motion raising a defense or an objection to an initial pleading under MCR 2.116, and any statutory prerequisites to the filing of such a pleading or motion, any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included for purposes of MCR 1.108(1).
>
> This order is intended to extend all deadlines pertaining to case initiation and the filing of initial responsive pleadings in civil and probate matters during the state of emergency declared by the Governor related to COVID-19. [AO 2020-3.]

As noted, the majority reads this order so as to apply only to deadlines that occurred during the emergency period. In doing so, it ignores the first paragraph of the order which states that "[f]or *all deadlines applicable to the commencement of all civil and probate case-types . . . any day that falls during the state of emergency declared by the Governor related to COVID-19 is not included for purposes of MCR 1.108(1)*." (Emphasis added). This paragraph contains no language restricting its scope to only those deadlines that would fall within the emergency period. Undaunted, the majority focuses exclusively on the second paragraph's use of the phrase "during the state of emergency" and opts to conclude that this ambiguous phrase means that no deadlines other than those that occur in the emergency period are affected. However, such analysis fails to explain how its interpretation of this phrase is consistent with the first paragraph since that

-3-

paragraph speaks to all cases and makes clear that "any day that falls during the state of emergency is not included." And the analysis utterly fails to explain how its restrictive interpretation of AO 2020-3 is consistent with the plain language of AO 2020-18.

Rather than addressing the unambiguous text of AO 2020-18, the majority opinion seems obsessed with whether *Carter* was properly decided and whether, it should have followed *Armijo v Bronson Methodist Hospital*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket Nos. 358728, 358729). However, *Carter* properly distinguished *Armijo*. The majority insists that *Armijo* requires us to hold that only deadlines that *expired* during the emergency period. However, as noted in *Carter*, there is no analysis of that issue in the *Armijo* opinion. See *Carter*, ___ Mich App at __ n 3, slip op at 5. *Armijo*'s analysis addressed only the AOs' effect on the notice-of-intent (NOI) waiting period. It concluded that the NOI waiting period "continued to run during the state of emergency," *Armijo*, ___ Mich App at ___; slip op at 7, and any reasonable reading of the opinion makes clear that the basis for the decision was that the administrative orders do not toll NOI waiting periods. Further, the panel in *Armijo* only discussed its interpretation of AO 2020-3 and AO 2020-3 as amended; it failed to account for the language in 2020-18 on which *Carter* relied.[5]

Here, the author, hangs his hat on one phrase in *Armijo*'s final paragraph, in which the opinion suddenly turned to a different issue that was neither necessary to the decision nor analyzed in the opinion. In the final paragraph of the opinion, *Armijo* states that in addition to the lack of NOI tolling, "the AOs only applied to deadlines which took place during the state of emergency." *Armijo*, ___ Mich App at ___; slip op at 7. No further explanation as to why, having decided the case based on the running of the NOI period, the *Armijo* panel—in this single conclusory phrase— offered a second, wholly unanalyzed alternative basis for its ruling. *Carter* properly and explicitly held that *Armijo* settled the question of whether the AOs tolled pre-suit waiting periods, but that *Armijo*'s single isolated reference to the far broader question about how the limitations periods were to be calculated following expiration of the emergency period was dicta. *Carter* did not—as the majority suggests —fail to follow *Armijo*. It simply recognized the difference between a "rule of law" and dicta.[6] In expressing a view that limitations periods that expired within the emergency

---

[5] *Armijo* did recount the text of AO 2020-18 in its "Background" section, but provided no analysis of it anywhere in the opinion even though it was the only one of the AOs that provided instruction on how to calculate limitations periods following the emergency period.

[6] "A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals" issued after 1990. MCR 7.215(J)(1). As we recently explained,

> A "rule of law" is a "substantive legal principle," according to *Black's Law Dictionary* (11th ed.). The rule of law typically justifies the "holding" in a case, which is defined as a "a court's determination of a matter of law pivotal to its decision." *Freed v Thomas*, 976 F3d 729, 738 (CA 6, 2020). In contrast, our Supreme Court has described "dicta" as "[s]tatements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand" that "lack the force of an adjudication." *Wold Architects & Engineers v Strat*, 474 Mich 223, 232 n 3; 713

period were extended, *Armijo* went well beyond what was necessary to decide the case, a point emphasized by the fact that the *Armijo* opinion offered no reasoning in support of this isolated and sweeping statement. I do not view *Carter*'s rejection of that dictum to have been incorrect, let alone "lawless" as the majority suggests.

The authoring judge in the instant case, authored the opinion in *Compagner v Angela Burch, PA-C*, ___ Mich App ___; ___ NW2d ___ (2023) (Docket No. 359699).[7] In that case,

_____

NW2d 750 (2006) (quotation marks and citations omitted). In other words, dicta is not necessary to the determination of the rule of law announced in an opinion. [*Michigan Occupational Safety and Health Admin v Yoder Family Farm*, 343 Mich App 77, 86; ___ NW2d ___ (2022).]

[7] It is important to note that *Compagner* was *not* a unanimous decision. Judge K.F. Kelly, writing in dissent, initially tried to point out the author's imprudence, writing in relevant part:

[T]he fundamental issue with the majority's reasoning [is that] it is backward-looking, examining the effect of AO 2020-3 from the benefit of two years of experience and hindsight. However, at the time AO 2020-3 was issued in March 2020, no one knew the breadth of the impact that COVID-19 would have on our court system. Many presumed the pandemic would run its course in a matter of days or weeks. Moreover, and perhaps more importantly, the courts across the state were simply unprepared to immediately facilitate faceless, electronic filings or remote hearings. While the majority observes that Ottawa County was a leader in the move toward electronic filings, the Michigan Supreme Court was, presumably, concerned not only with Ottawa County, but every county and court system within the state. It is also noteworthy that the majority carefully avoids making the sweeping assertion that *every* court was open to the public during the state of emergency, merely stating that "courts *largely* remained open during the state of emergency" and that trial courts "*generally* continued to accept court filings." (Emphasis added.) In other words, what of the courts that were not open, or that, for some period of time, could not accept court filings? I must presume that the Supreme Court, when issuing AO 2020-3, was considering those corner cases when crafting the order.

Contrary to the majority, I would conclude that AO 2020-3 was a proper exercise of the Michigan Supreme Court's constitutional power. The ability for litigants to access the courts was at issue, and the Court had a responsibility to ensure access. But even if I were to agree that AO 2020-3 was unconstitutional—it was not—I also disagree with the majority's remedy should *Carter* be overruled. According to the majority, "but for *Carter*, we would reverse and remand for entry of summary disposition in favor of defendants." Doing so would act as a great injustice to the lawyers and litigants around the state legitimately acting in reliance on orders issued by the Supreme Court in a time of chaos and uncertainty. In other words, under the majority's reasoning, AO 2020-3 should have been identified by every

decided about six months after *Carter*, he criticized *Carter* but did not refuse to follow it, stating in the second sentence of the opinion, "Because we are bound by this Court's decision in *Carter* . . . , we affirm." *Id*. at ___; slip op at 2. Further, the *Compagner* panel requested a conflict panel as to *Carter*, but only as to the constitutionality authority question and not as to the proper application of the AOs in relation to the statute of limitations. See *id*. The reasons for limiting the request are not clear, but had *Carter* been seen as erroneous and inconsistent with *Armijo*, such a request could easily have been made. [8] In any event, the request for a conflict panel was declined by the full Court, making *Carter* binding precedent.

It is now nearly a year since *Carter* and the author of *Compagner* appears to have had second thoughts about his failure to include the application of the AOs in the request a conflict panel. And now that the Supreme Court has granted leave in *Carter*, a conflict panel on the time calculation issue cannot be requested. MCR 7.215(J)(3)(b).[9] Rather than respecting this rule and awaiting a decision from the Supreme Court, the majority seeks to declare that *Carter* is null and void.

I believe it fair criticism to inquire why the majority refuses to wait for a final ruling from our Supreme Court. Examination of the question begins with citing to the majority's only stated reason for not waiting for the Supreme Court to decide these cases, and instead to defy MCR 7.215(C)(2): "we must decide which decision is binding on us in this matter." But that decision was made by this Court when it rejected the author's request for a special panel. And, if that were really the reason *Compagner* would not have agreed that *Carter* was controlling. Further, if the majority is to have any semblance of consistency, why instead did the majority's author, allowing months to pass during which *Carter* was followed and when a conflict panel can no longer be sought and the Supreme Court is about to address the question, invite chaos by creating two different lines of cases for trial courts and attorneys to struggle over. The majority says they take this step because they are "compelled" to do so. However, the *Compagner* panel was not similarly compelled.[10]

---

> lawyer as unconstitutional and, as a result, would be obligated to not act in reliance on it. I cannot countenance a decision that would, in effect, say lawyers were perhaps constitutionally ineffective by relying on orders issued by the highest court in this state, whose responsibility it is to administer the state's court system. *Compagner*, ___ Mich App at 20.

[8] If a litigant failed to seek review of an issue, we would conclude that the issue had been forfeited. Indeed, a litigant who affirmatively agreed that a prior case controlled, would have waived the issue altogether.

[9] The rule provides that "No [conflict] panel shall be conducted a special panel shall not be convened if at the time the judges are required to be polled, the Supreme Court has granted leave in the controlling case."

[10] The majority also observes that it writes because "we believe that the Supreme Court would benefit from the analysis set forth in this opinion." That may be so, but it would have been equally available to the Supreme Court had the analysis been included as a concurrence following *Carter*,

In any event, it is important to note that the majority miscomprehends *Carter*. *Carter* correctly distinguished *Armijo* because *Armijo* involved a tolling of a pre-suit waiting period while *Carter* involved the tolling of a statute of limitations. Moreover, *Carter* is directly on point and dispositive of this matter. Just as in *Carter*, plaintiff's statutory deadline was set to expire after the 102-day emergency period. However, as stated in *Carter*, our Supreme Court excluded these 102 days even for those whose deadlines did not expire within the emergency period. Accordingly, the entirety of the 102 days was excluded from calculating the two-year statutory limitations period under MCR 1.108. This meant that, when plaintiff filed her NOI on December 11, 2020, she did not have only one day remaining on the statutory limitations period. Rather, she had 1 + 102 days remaining because those 102 days between March 10, 2020 and June 20, 2020, were excluded. The NOI tolled the statutory limitations period for 182 days, which meant that the statutory limitations period began to run again on June 11, 2021. At this point, plaintiff had 103 days remaining, which meant that she had until September 22, 2021, to file her complaint. Therefore, because plaintiff filed her complaint on September 21, 2021, her complaint was timely.

It is clear that *Carter* controls our decision. What gives me great concern about the majority's opinion is that they have egregiously surmised that neither *Carter* or the vote rebuffing their call for a special panel was entitled to anything other than their disdain. Such disdain has created an opinion which allows any two members of this Court to be able to cite to this case and by doing so, overrule binding published precedent. This is the real legacy of the majority's decision, discarding the rule of law, the doctrine of stare decisis and inviting chaos for our trial courts and attorneys. For these reasons, I vigorously dissent.

/s/ Stephen L. Borrello

---

but setting out its disagreements with that decision. The Supreme Court reads our Court's concurrences and dissents as well as majority opinions.